Jennifer J. Middleton, OSB #071510
jmiddleton@chantilaw.com
Suzanne B. Chanti, OSB #88179
schanti@chantilaw.com
Chanti & Middleton, PC
245 East 4th Avenue
Eugene, OR 97401
Phone: 541/683-2506
Fax:    541/683-3149
        Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **MEGAN E. COTTIER,** | Case No. 08-6076-AA |
| Plaintiff, | **COMPLAINT** |
| vs. | **(Violation of 42 U.S.C. § 2000e; ORS § 659A.030; Wrongful Discharge; Intentional Infliction of Emotional Distress)** |
| **NATIONAL STEELCRAFTERS OF OREGON, LLC, and RICHARD McEVOY** | |
| Defendants. | **Demand for Jury Trial** |

## JURISDICTIONAL ALLEGATIONS

1.

Claims asserted herein arise under the Civil Rights Act of 1964, 42 USC § 2000e *et seq*,

as amended (Title VII) and state statutory and common laws.  This Court has jurisdiction over

the federal claims under 28 USC § 1331, 42 USC § 2000e-5(f)(3), and 42 USC § 1988.  State

law claims arise from the same common nucleus of operative facts and jurisdiction is proper

under 28 USC § 1367(a).

**PAGE 1 – COMPLAINT**

2.

Costs and attorney fees may be awarded pursuant to the Civil Rights Act as amended, 42

USC § 1988, 42 USC § 2000e-5(k), ORS § 659A.885, and Fed. R. Civ. P. 54(d).


## ALLEGATIONS OF PARTY STATUS

3.

At all material times, Plaintiff Megan E. Cottier ("Megan Cottier") was and is a female

citizen of the United States, residing in Lane County, Oregon.

4.

At all material times, Defendant National Steelcrafters of Oregon, LLC (also known as

Breckwell Hearth Products) was a pellet stove manufacturing business incorporated in the state

of Delaware and authorized to do business in Oregon.   At all material times, National

Steelcrafters of Oregon, LLC ("National Steelcrafters") employed more than fifteen (15) people

at its Eugene, Oregon manufacturing location.

5.

At all material times, Defendant Richard McEvoy was employed by Defendant National

Steelcrafters as its Operations Manager in its Eugene, Oregon facility.   At all material times,

Defendant McEvoy acted within the course and scope of his employment in undertaking the acts

described herein.

## ALLEGATIONS OF FACT

6.

Megan Cottier was hired as a full-time employee at National Steelcrafters' Eugene, Oregon facility on November 10, 2005. She was hired by welding foreman Bill Lawson to be a welder in the parts department on the swing shift (2:30 pm – 11:00 pm).

7.

When Megan Cottier arrived for her first day of work, she discovered she was the only female welder among as many as fifty or more welders. There was only one other woman in the entire facility, Sharon, who was a receptionist/clerical in the small front office.

8.

The first thing Megan Cottier noticed when she started work were the obscene, centerfold-type posters of nude women hanging throughout the welding areas. These posters were full-size and calendar-size depictions of women who were either entirely naked, or wearing clothing that left their breasts and crotch areas fully revealed. In the pictures, the women stood, bent over, or laid back in suggestive and beckoning poses.

9.

Megan Cottier found the posters of naked women hanging throughout the work area shocking, offensive and degrading to women.

10.

Megan Cottier deliberately took roundabout routes to the bathroom and to areas where she had to pick up parts and tools in an effort to avoid walking past the offensive posters. It was impossible to avoid them entirely, however.

11.

National Steelcrafters' employee handbook provides that "[d]isplaying obscene or pornographic material on National Steelcrafters premises" is against company policy and grounds for termination.

12.

Defendant Richard McEvoy, operations manager of the Eugene facility, was in the manufacturing area throughout the day. He was fully aware of the offensive posters. He took no action to have them removed or to discipline anyone who posted them.

13.

National Steelcrafters is owned by Jim Schultz, based at the company's Arlington, Texas facility. Mr. Schultz visited the Eugene, Oregon facility periodically and was also aware of the obscene posters. Mr. Schultz took no action to enforce company policy by disciplining employees who displayed the posters, nor did he require that the posters be removed.

14.

Megan Cottier's male co-workers stared at her when she walked past. She sometimes noticed co-workers who were speaking Spanish among themselves making gestures that obviously referred to large breasts or the shape of a woman's behind. Other co-workers remarked that "girls should not be doing this kind of work," or words to that effect.

15.

The posters made Megan Cottier very uncomfortable and self-conscious about being a female in the workplace. She took to wearing oversized sweatshirts and other loose clothing in an effort to deflect attention from her body. She stopped wearing makeup and deliberately left her hair looking messy. When she walked through the shop, she left her safety hood on to cover

her face and kept her eyes looking at the floor.  The work area with its many welding tools was often very hot, but Megan Cottier stuck to long sleeves and long pants even in the hot weather.

16.

In addition to having to work around the obscene posters all day, Megan Cottier was denied a promotion and a raise and otherwise treated less favorably than her male counterparts in the terms and conditions of her work because of her sex.

17.

In or about January or February 2006, National Steelcrafters had an opening for a stove welder on the morning shift.  Stove welding requires a higher degree of skill and is paid a higher wage than the parts welding to which Megan Cottier was assigned.

18.

Megan Cottier's boyfriend, Charles Szekretar, also worked as a parts welder at National Steelcrafters.  He had been hired shortly before Megan Cottier.  Welding foreman Bill Lawson approached Mr. Szekretar and asked him whether he wanted the available stove welding position.  Mr. Szekretar said no because he did not want to switch shifts.

19.

Welding foreman Lawson then selected a male employee who had been hired after Megan Cottier and asked him if he wanted the stove welder position.  That employee took it. Megan Cottier asked foreman Lawson why he did not offer her the position.  Foreman Lawson said that he assumed that she did not want the job because her boyfriend did not want the earlier shift.

20.

After that, Megan Cottier made sure that foreman Lawson knew that she wanted the stove welding position.  But the next time there was an opening for a stove welder position, Lawson selected another male employee.

21.

After repeated requests, Megan Cottier was finally told she would be promoted to stove welder in or about March, 2006.  Welding foreman Lawson and Defendant McEvoy told Megan Cottier that the company's policy was to assign a welder to stove welding and if he or she was able to make a certain quota for five (5) days in a row, s/he would receive the raise that went with the position.

22.

Defendant McEvoy assigned Megan Cottier in the stove welding position only part-time, however, blocking her ability to prove she could make the quota.  As soon as she made the quota for a few days in a row, she would get assigned back in parts and told that she had to make the quota five (5) *consecutive* days, so she did not qualify for the raise.  She was never given the stove welding raise, despite working as a stove welder for months.

23.

Males who were promoted to stove welding both before and after Megan Cottier were scheduled full-time in the position so they had the opportunity to make quota.  When they did, they received raises.

24.

Megan Cottier complained to her immediate supervisor, Al Breckel, about the way she was being assigned. Supervisor Breckel said that it was Defendant McEvoy's decision. By way of explanation, Breckel said that Defendant McEvoy was "a woman-hater."

25.

Megan Cottier was already aware of Defendant McEvoy's attitude. He spoke to her in a rude and condescending manner and singled her out for disfavorable treatment compared to her male colleagues. Examples include, but are not limited to:

     a.    Defendant McEvoy would yell at Megan Cottier if she was not at her welding station, welding, with all of her safety gear on and the appropriate parts ready, at the time she was supposed to clock in. Male co-workers would still be gathering their things and milling about.

     b.    Defendant McEvoy accused Megan Cottier in front of her co-workers of things she did not do, such as using other peoples' parts for her stoves rather than welding her own.

     c.    Defendant McEvoy excessively scrutinized Megan Cottier's work, watching over her shoulder while she was welding. He expressed surprise that she knew what she was doing.

     d.    When Megan Cottier requested time off, well in advance, because she had been subpoenaed to testify in court, Defendant McEvoy threatened to fire her if she took it. Megan Cottier had to go around Defendant McEvoy to owner Jim Schultz to get permission for the time off.

e.    Defendant McEvoy refused to provide appropriate safety gear that properly fit Megan Cottier.

(1)    When working on stoves, a welder ordinarily sits at a lower table than she would use for welding parts.  When Megan Cottier was required to switch back and forth between welding stoves and welding parts, she had to work on both at the same low table.  This required her to lean far forward over the lower table when she was working on parts.  Her safety hood fell to her mid-chest, and when she leaned over and tilted her chin down, her chest would force the mask up and it would pop off.  The condition was dangerous as Megan Cottier would lose her eye protection when bending over with the welding torch.

(2)    When her mask popped off, the welder seated next to her laughed and remarked, "your boobs are too big!"  It became a standing joke.  Men did not have the same problem with the hoods.

(3)    Megan Cottier repeatedly asked Defendant McEvoy for a different variety of welding hood that is designed to fall only to the bottom of the chin.  Defendant McEvoy took no action to get a hood that would fit Megan Cottier properly.

f.    McEvoy refused to fix Megan Cottier's welding equipment in a timely manner when it broke down, while men's machines were promptly repaired.

26.

On or about June 8, 2006, Megan Cottier's machine began to malfunction.  It was "arcing" out, emitting sparks even when the trigger was not engaged.  The voltage was stuck

open. Megan Cottier immediately informed Supervisor Breckel. He asked two male co-workers to look at it, and the machine did the same to them. Megan Cottier moved to a different station.

27.

Supervisor Breckel spoke to Defendant McEvoy about the malfunction. Breckel reported to Megan Cottier that Defendant McEvoy said, "the problem is her, not the machine." When she heard about the remark, Megan Cottier asked several of her male co-workers if Defendant McEvoy had ever said anything like that about them. They all said no.

28.

Megan Cottier went to McEvoy's office to complain. She told him she was offended by his comment that the problem was her, not the machine. She asked him why he said it and whether he had ever said that about any of the men. She also told him about the other male employees who had the same experience with the machine. Defendant McEvoy claimed he would call the repair shop, but he did not. The machine continued to malfunction.

29.

The hostile environment and differential treatment caused Megan Cottier significant distress and interfered with her relations with her family. She became ashamed about her body and lost confidence in her abilities. She was too embarrassed and humiliated to tell her family about the degrading conditions in which she had to work. She would cry on her drive to work because she was so upset at the prospect of going back in there.

30.

On or about June 26, 2006, it was over 100 degrees in the welding area, the air scrubbers were not running, and Megan Cottier became sick from the metal fumes and chemicals. She left

work and went to the doctor, who ordered that she be placed in a cooler environment with clean air.

31.

Megan Cottier returned to work under medical restrictions. Defendant McEvoy placed her in a new welding station -- one of the stations with an obscene poster immediately overhead.

32.

The air was no different in the new welding station. The air scrubbers were still not working, it was still hot and Megan Cottier became sick again from the metal fumes. She called in sick the next day and made an appointment with the doctor.

33.

On or about June 29, 2006, Defendant McEvoy telephoned Megan Cottier at home and fired her.

34.

Megan Cottier filed a timely complaint of sex discrimination with the Oregon Bureau of Labor & Industries (BOLI) and the Equal Employment Opportunity Commission (EEOC). On or about December 6, 2007, BOLI found substantial evidence to support Megan Cottier's claims of discrimination and issued a 90-day right to sue letter.

### FIRST CLAIM FOR RELIEF
### Violation of Title VII
### (Against Defendant National Steelcrafters)

For her first claim against Defendant National Steelcrafters, Plaintiff Megan Cottier alleges as follows:

35.

Megan Cottier realleges the allegations set forth in paragraphs 1 through 34 and incorporates them by reference as if fully set forth herein.

36.

Defendant National Steelcrafters subjected Megan Cottier to pervasive sexual harassment.  The conditions under which Defendant National Steelcrafters forced Megan Cottier to work had the purpose and/or effect of unreasonably interfering with her work performance and creating an intimidating, hostile, and offensive working environment.

37.

Defendant National Steelcrafters failed to exercise reasonable care to prevent the hostile work environment and failed to take prompt corrective action to end the hostile work environment that it knew existed.

38.

Defendant National Steelcrafters discriminated against Megan Cottier with respect to her compensation, terms, conditions, or privileges of employment because of her sex.  Defendant National Steelcrafters subjected Megan Cottier to intolerable terms and conditions of work to which it did not subject its male employees.  Defendant National Steelcrafters terminated Megan Cottier because she is female and because she complained about Defendants' discriminatory treatment.

39.

Defendant National Steelcrafters retaliated against Megan Cottier because she opposed unlawful discrimination in the workplace.

40.

As a result of Defendant National Steelcrafters' unlawful conduct, Megan Cottier lost wages and benefits in the current amount of over $20,000, plus prejudgment interest thereon. These damages are continuing.

41.

As a result of Defendant National Steelcrafters' unlawful conduct, Megan Cottier suffered noneconomic damages, including emotional distress, humiliation, anxiety, depression, sleeplessness, shame, loss of career and impairment of earning capacity. These damages are continuing. Megan Cottier is entitled to recover payment for these damages in the amount of $300,000 or other amount to be determined by the jury at trial, but not to exceed $300,000.

42.

Defendant National Steelcrafters' unlawful actions were intentional or taken in reckless disregard of Megan Cottier's rights and punitive damages should be awarded to punish Defendant and to deter it and others from acting in a similar manner in the future. Megan Cottier is entitled to recover payment for these damages in the amount of $300,000 or other amount to be determined by the jury at trial, but not to exceed $300,000.

43.

Megan Cottier is entitled to recover her reasonable attorney fees and costs pursuant to 42 USC § 2000e-5(k) and 42 USC § 1988.

44.

Megan Cottier is entitled to such other relief as the Court may deem equitable.

## SECOND CLAIM FOR RELIEF
### Violation of ORS §659A.030
### (Against All Defendants)

For her second claim against all Defendants, Plaintiff Megan Cottier alleges as follows:

### 45.

Megan Cottier realleges the allegations set forth in paragraphs 1 through 34 and incorporates them by reference as if fully set forth herein.

### 46.

Defendants subjected Megan Cottier to pervasive sexual harassment.  The conditions under which Defendants forced Megan Cottier to work had the purpose and/or effect of unreasonably interfering with her work performance and creating an intimidating, hostile, and offensive working environment based on sex.

### 47.

Defendants failed to exercise reasonable care to prevent a hostile work environment and failed to take prompt corrective action to end the hostile work environment that they knew existed.

### 48.

Defendant National Steelcrafters discriminated against Megan Cottier with respect to her compensation, terms, conditions, or privileges of employment because of her sex.  Defendant National Steelcrafters subjected Megan Cottier to intolerable terms and conditions of work to which it did not subject its male employees.  Defendants terminated Megan Cottier because she is female and because she complained about Defendants' discriminatory treatment.

49.

Defendants retaliated against Megan Cottier because she opposed unlawful discrimination in the workplace.

50.

As a result of Defendants' unlawful conduct, Megan Cottier lost wages and benefits in the current amount of over $20,000, plus prejudgment interest thereon. These damages are continuing.

51.

As a result of Defendants' unlawful conduct, Megan Cottier suffered noneconomic damages, including emotional distress, humiliation, anxiety, depression, sleeplessness, shame, loss of career and impairment of earning capacity. These damages are continuing. Megan Cottier is entitled to recover payment for these damages in an amount to be determined by the jury at trial.

52.

Defendants' unlawful actions were intentional or taken in reckless disregard of Megan Cottier's rights and punitive damages should be awarded to punish Defendants and to deter them and others from acting in a similar manner in the future. Megan Cottier is entitled to recover payment for these damages in an amount to be determined by the jury at trial.

53.

Megan Cottier is entitled to recover her reasonable attorney fees and costs pursuant to ORS § 659A.885.

54.

Megan Cottier is entitled to such other relief as the Court may deem equitable.

### THIRD CLAIM FOR RELIEF
### Wrongful Discharge
### (Against Defendant National Steelcrafters, Inc.)

For her third claim against Defendant National Steelcrafters, Plaintiff Megan Cottier alleges as follows:

55.

Megan Cottier realleges the allegations set forth in paragraphs 1 through 34 and incorporates them by reference as if fully set forth herein.

56.

Defendants National Steelcrafters discharged Megan Cottier because she fulfilled a societal obligation or public duty or pursued a right related to employment, including but not limited to:

      a.    Asserting her right to be free from sex discrimination in the workplace;

      b.    Asserting her right to work in an environment free from derogatory comments based on sex;

      c.    Asserting her right to complain about unlawful employment practices and continue working;

      d.    Asserting her right to have proper safety gear and a safe and healthy working environment.

57.

As a result of Defendant National Steelcrafters' unlawful conduct, Megan Cottier lost wages and benefits in the current amount of over $20,000, plus prejudgment interest thereon. These damages are continuing.

58.

As a result of Defendant's unlawful conduct, Megan Cottier suffered noneconomic damages, including emotional distress, humiliation, anxiety, depression, sleeplessness, shame, loss of career and impairment of earning capacity. These damages are continuing. Megan Cottier is entitled to recover payment for these damages in the amount of $1,000,000 or other amount to be determined by the jury at trial.

59.

Defendant National Steelcrafters' actions as described herein were intentional or taken in reckless disregard of Megan Cottier's rights and punitive damages should be awarded to punish Defendant and to deter it and others from acting in a similar manner in the future. Megan Cottier is entitled to recover payment for these damages in the amount of $1,000,000 or other amount to be determined by the jury at trial.

### FOURTH CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress
### (Against All Defendants)

For her fourth claim against all Defendants, Plaintiff Megan Cottier alleges as follows:

60.

Megan Cottier realleges the allegations set forth in paragraphs 1 through 34 above and incorporates them by reference as if fully set forth herein.

61.

Defendants' actions as described herein were taken with intent to cause Megan Cottier severe emotional distress or with knowledge that such distress was substantially certain to cause Megan Cottier severe emotional distress.

62.

Defendants' actions as described herein constitute an extraordinary transgression of the bounds of socially tolerable conduct.

63.

As a result of Defendant National Steelcrafters' unlawful conduct, Megan Cottier lost wages and benefits in the current amount of over $20,000, plus prejudgment interest thereon. These damages are continuing.

64.

As a result of Defendants' unlawful conduct, Megan Cottier suffered severe emotional distress, including, but not limited to:  humiliation, anxiety, depression, sleeplessness, shame, loss of career and impairment of earning capacity.   These damages are continuing.   Megan Cottier is entitled to recover payment for these damages in the amount of $1,000,000 or other amount to be determined by the jury at trial.

65.

Defendants' actions as described herein were intentional or taken in reckless disregard of Megan Cottier's rights and punitive damages should be awarded to punish Defendants and to deter them and others from acting in a similar manner in the future.  Megan Cottier is entitled to recover payment for these damages in the amount of $1,000,000 or other amount to be determined by the jury at trial.

WHEREFORE Megan Cottier prays for judgment against Defendants as follows:

1.      Lost wages and benefits in an amount to be determined at the date of trial, together with prejudgment interest thereon;

2.     Non-economic damages in the amount of $1,000,000 or other amount to be determined by the jury at the time of trial;

3.     Punitive damages in the amount of $1,000,000 or other amount to be determined by the jury at the time of trial;

4.     Her reasonable attorney fees and costs incurred herein; and

5.     Such other relief as the Court deems just and equitable.

DATED:  March 4, 2008.


CHANTI & MIDDLETON, P.C.


By:
        Jennifer J. Middleton, OSB #071510
        541/683-2506
        541/683-3149
        jmiddleton@chantilaw.com.com
            Attorneys for Plaintiff Megan Cottier